IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH PATRICK | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-1209 |
| DEVON HEALTH SERVICES, INC. | : | |

**SURRICK, J.**                                                    **NOVEMBER  18 , 2011**

<u>**MEMORANDUM**</u>

Presently before the Court are Plaintiff Joseph Patrick's Motion for Summary Judgment

or Alternatively Motion for Bench Trial (ECF No. 17) and Defendant Devon Health Services,

Inc.'s Motion for Summary Judgment (ECF No. 18).  For the following reasons, Defendant's

Motion will be granted, and Plaintiff's Motion will be denied.

**I.      BACKGROUND**

**A.      Plaintiff's Single-Vehicle Automobile Accident**

Plaintiff is a former employee of Defendant.  (Patrick Dep. 6-10, Feb. 17, 2010, Def.'s

Summ. J. Mot. Ex. B.)  On November 28, 2007, while still employed by Defendant, Plaintiff was

involved in a single-vehicle automobile accident on Route 23 in Schuylkill Township, Chester

County, Pennsylvania.  (*Id.* at 10, 23.)   At 4:30 p.m. on that date, Plaintiff left work at

Defendant's King of Prussia office to meet co-workers for dinner and drinks at a restaurant called

Sly Fox.  (*Id.* at 10-14.)   Plaintiff drank four or five beers at Sly Fox.  (*Id.* at 16-17; *see also*

Patrick Dep. 21, Aug. 8, 2008, Def.'s Summ. J. Mot. Ex. A.)[1]  At 6:30 p.m. that evening,

---

[1] It is not clear from the record whether Plaintiff ate anything at Sly Fox.  On August 8,
2008, Plaintiff testified that he did not have anything to eat at Sly Fox.  (Patrick Dep. 21, Aug. 8,
2008.)  On February 17, 2010, Plaintiff testified that he ate wings and a burger at the restaurant.
(Patrick Dep. 16-17, Feb. 17, 2010.)

Plaintiff left Sly Fox to meet his then-girlfriend at Doc McGrogan's, a restaurant located in

Phoenixville, Pennsylvania.  (Patrick Dep. 21-22, Aug. 8, 2008; Patrick Dep. 17-18, Feb. 17,

2010.)[2]  At 7:00 p.m. that evening, Plaintiff left Doc McGrogan's to go home.  (Patrick Dep. 29,

Aug. 8, 2008; Patrick Dep. 22, Feb. 17, 2010.)  At 7:35 p.m., while driving eastbound on Route

23/Valley Forge Road, Plaintiff was involved in a one-vehicle accident outside of Valley Forge

Park.  (Patrick Dep. 29, Aug. 8, 2008; Patrick Dep. 23; Police Rep. 1, Def.'s Summ. J. Mot. Ex.

C.)  Plaintiff estimates that the accident occurred a few minutes after he left Doc McGrogan's

and one or two miles from that restaurant.  (Patrick Dep. 29, Aug. 8, 2008; Patrick Dep. 23, Feb.

17, 2010.)  Shortly after the accident, the police and an emergency ambulance crew were

dispatched to the accident scene.  (EMS Rep. 1, Def.'s Summ. J. Mot. Ex. D (dispatched at 7:36

p.m. and arriving at 7:36 p.m.); *see also* Police Rep. 1 (police officer arriving at 7:48 p.m.).)

Police Officer John R. Kane of the Schuylkill Township Police Department investigated

the accident and completed a Police Crash Reporting Form ("Police Report").  The investigation

revealed that Plaintiff's vehicle had left the roadway and hit a fixed object.  It was dark at the

time of the accident, and there were no streetlights.  The road conditions were dry, and there were

no adverse weather conditions.  (Police Rep. 4.)  Officer Kane ruled out environmental or

roadway factors and possible vehicle failure as potential contributing factors to the accident.

(*Id.*)  He cited speed as a factor in causing the accident.  (*Id.*)  Plaintiff's vehicle had been

traveling in the eastbound lane at a high rate of speed when it failed to negotiate a curve.  The

---

[2] It is not clear what, if anything, Plaintiff had to eat or drink at Doc McGrogan's.  On
August 8, 2008, Plaintiff testified that he ate a salad there but did not have anything else to drink.
(Patrick Dep. 22, Aug. 8, 2008.)  On February 17, 2010, Plaintiff could not recall whether he had
anything to eat or drink at Doc McGrogan's.  (Patrick Dep. 21, Feb. 17, 2010.)

vehicle left the roadway, traveled 226.5 feet and then hit a stone sign for Valley Forge National

Park.  (*Id.* at 5.)  Upon hitting the sign, the vehicle went airborne for 44 feet 11 inches, flipped

over, end over end, and then came back onto the roadway.  The final resting place of the vehicle

was 64 feet 4 inches from its impact with the stone sign.  (*Id.*)  The Police Report indicated that

the driver "[h]ad [b]een [d]rinking" and was charged.  (*Id.* at 2.)   The front air bag had deployed,

and Plaintiff had used his seatbelt and was not ejected from the vehicle.  (*Id.* at 3.)  Officer Kane

opined:

> It is this Officer's belief that the driver had been under the influence of alcohol at the
> time of the accident and therefore was not capable of operating a vehicle in a safe
> manner.  Also, the speed was a secondary factor in the accident for the reason that the
> vehicle basically destroyed the stone and steel sign and went airborne after hitting the
> sign.  In conclusion, it was a combination of two factors that caused the accident.

(*Id.* at 5-6.)  There were several witnesses to the accident who gave statements to Officer Kane.

(*Id.*)  Medical records indicated that Plaintiff's BAC was 0.192.  (*Id.* at 2, 5-6.)

The EMS crew arrived at 7:36 p.m. and observed severe damage to Plaintiff's vehicle,

including windshield and steering wheel damage, dashboard displacement and a damaged and

pushed-in roof.  (EMS Rep. 1.)  The crew could not gain access to Plaintiff until the fire

department arrived, stabilized the vehicle and gained access to Plaintiff.  (*Id.*)  The EMS Report

reveals that the EMS crew found Plaintiff in the driver's seat but slumped over in the passenger's

seat.  (*Id.*)  Although Plaintiff answered when spoken to, he was "incoherent."  (*Id.* at 1, 3.)

Plaintiff appeared lethargic and confused as to time, place and current events.  However, he told

the EMS crew that he had "had a lot to drink."  (*Id.* at 1.)  He had slurred speech, blood coming

from his nose, visible abrasion or bruising on his left mid-clavicular chest, deformity in his left

femur, a large laceration to his right shin and abrasions to his right posterior hand.  (*Id.*)  He

complained of bilateral leg pain.  (*Id.*)  The EMC crew observed ETOH odor.  (*Id.*)[3]  Plaintiff

was transported from the accident scene to the Hospital of the University of Pennsylvania

("HUP") by helicopter at 8:01 p.m. that evening.  (*Id.*)

At 8:21 p.m., Plaintiff arrived at the HUP, where he was treated for a broken left femur,

pelvis and right hip.  (HUP Rep. at 7, Def.'s Summ. J. Mot. Ex. E; Patrick Dep. 29, Feb. 17,

2010.)Tests were conducted on Plaintiff.  (HUP Rep. at 2-3.)  While the tests showed negative

results for drugs, such as amphetamines, opiates, barbiturates, benzodiazepines, THC and

methadone, an ETOH test ordered on 8:59 p.m. that evening showed that Plaintiff's serum

alcohol concentration was 192 mg/dL, which converts to a blood alcohol concentration ("BAC")

of 0.16 percent.  (*Id.* at 3, 5; Cohn Rep. 3, Def.'s Summ. J. Mot. Ex. F.)  The Initial Inpatient

Admission/Consultation form of the HUP records ("HUP Records"), dated November 28 at 9:00

p.m., describes Plaintiff's history as follows:  a "29 yo male unrestrained driver was involved in a

MVA tonight –> intoxicated –> multiple extremity injuries."  (HUP Rep. 6.)  The "History of

Present Illness/Injury" section of the form states that "[o]n physical exam the patient presents as

conscious and alert and obvious[ly] intoxicated.  The patient admits to drinking and states that he

consumed a considerable amount of alcohol.  Denies street drug use."  (*Id.* at 7.)

On November 29, 2007, Plaintiff was transferred to Temple University Hospital.  (*Id.* at

9.)  Plaintiff remained at this hospital for two weeks, then was admitted to Bryn Mawr

Rehabilitation Hospital, where he was treated for two weeks.  (Patrick Dep. 29, Feb. 17, 2010.)

Medical bills for the hospitalizations and further treatment of the injuries sustained in the

---

[3] ETOH is the chemical abbreviation for ethyl alcohol or ethanol, the medical term for
alcohol.  *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1193 n.4 (11th Cir. 2010).

4

accident total $871,693.37.  (Moffa Dep. 92, Jan 14, 2010, Def.'s Summ. J. Mot. Ex. H & Ex. Moffa-5 (claims ledger).)[4]

On December 18, 2007, Plaintiff was charged with driving under the influence in violation of 75 Pa. Cons. Stat. Ann. §§ 3802(A)(1), (A)(2), (B) and (C).  (Pa. Ct. Comm. Pls. Dkt., Def.'s Summ. J. Mot. Ex. G.)  Plaintiff was admitted to the Chester County Accelerated Rehabilitation Disposition ("ARD") program on April 1, 2008.  (*Id*.)[5]

### B.     The Devon Health Services, Inc. Employee Health Care PPO Plan

At the time of the accident, Plaintiff was covered by the Devon Health Services, Inc. Employee Health Care PPO Plan ("Plan") under a self-funded scheme.  (Moffa Dep. 23.)[6]  Under the Plan, claims for medical benefits are submitted to the Plan's third party administrator, UHY Advisors d/b/a/ Insurance Design Administrators ("IDA").  IDA then processes the claims to

---

[4] Felicia Moffa, Defendant's health plan administrator ("Plan Administrator"), testified that she believed this figure was calculated before re-pricing by IDA.  (Moffa Dep. 92-93.)

[5] The ARD program permits a prosecutor to ask the court to place a defendant on probation without trial.  If ARD is approved by the court and the defendant satisfactorily completes the probationary period, his or her charges are dismissed.  *Cain v. Darby Borough*, 7 F.3d 377, 379 (3d Cir. 1993).

[6] Under a "standard" scheme, the employer will contract with an insurer and receive a premium rate.  The employer will pay that rate regardless of the amount claimed in benefits.  If the claim amount for a given period is small, the employer will not receive a rebate.  If the claim amount for a given period is large, there will be no additional charge to that employer, so long as the premium has been paid.  By contrast, a self-funding insurance scheme allows the employer to pay the value of the claims as they are in incurred.  Practically speaking, if the amount of the claims submitted is small, the employer will likely save on costs, when compared to the "standard" scheme.  Typically, in order to protect itself against large claims, the self-funded employer will obtain excess loss insurance, also known as stop-loss insurance.  Under this arrangement, the employer is responsible for a specific retention amount, which it must fund up to a particular set amount of money.  After the retention amount is reached or paid by the employer, the excess loss insurance company pays the remaining amount of the claim. (Roslokken Dep. 9-10, Pl.'s Br. Ex. D.)

ensure that all documentation required for payment of the claim had been submitted and that the

service was covered under the Plan.  (Clark Dep. 8-10, Mar. 11, 2010, Pl.'s Summ. J. Mot., Ex.

E, ECF No. 19.)  IDA then re-prices the claim in accordance with an agreed-upon re-pricing

schedule and submits the claim to Defendant for payment.  (*Id.* at 8-10, 52.)  Defendant then pays

the claim.  (Moffa Dep. 30.)  Defendant used United of Omaha Life Insurance Company

("Mutual of Omaha") as a stop-loss carrier for medical claims submitted by Defendant's

employees exceeding $100,000.  (*Id*. at 25-26.)  Under this arrangement, Defendant was

obligated to pay the first $100,000 of medical benefits per individual claim, and Mutual of

Omaha was obligated to make the remaining payments on the claim, up to $1,900,000, assuming

the claim was covered.  (Omaha Cert., Def.'s Summ. J. Mot., Ex. O.)  Under the Plan, Defendant

determines whether an employee is eligible for benefits and then pays those benefits out of its

own pocket on a claim-by-claim basis.  (Clark Dep. 9-10, 33-34, 54; Madonna Dep. 45, Pl.'s

Summ. J. Mot., Ex. F.)

      The Plan includes certain exclusions, including the following:

> For all Medical Benefits shown in the Schedule of Benefits, a charge for the following is not covered:
>
> . . . .
>
> 48.  Illegal Acts.  Charges for services received as a result of Injury or Sickness caused by or contributed to by engaging in an illegal act or occupation; by committing or attempting to commit any crime, criminal act, assault or other felonious behavior; or by participating in a riot or public disturbance.  This exclusion does not apply if the injury resulted from an act of domestic violence or a medical (including physical and mental health) condition.

("Illegality Exclusion") (Plan 22, 26, Def.'s Summ. J. Mot. Ex. J.)

      The Plan provides the Plan Administrator with broad authority to interpret the terms of

the Plan and to make determinations regarding issues concerning eligibility for benefits.

Specifically, the Plan provides:

> The Plan Administrator shall administer this Plan in accordance with its terms and establish its policies, interpretations, practices, and procedures.  It is the express intent of the Plan that the Plan administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of this Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to the Plan Participants rights, and to decide questions of Plan interpretation and those of fact relating to this Plan.  The decision of the Plan Administrator will be final and binding on all interested parties.

(*Id*. at 17.)

If a claimant receives an adverse benefit determination, the claimant has 180 days following receipt of notification to appeal the decision.  (*Id*. at 6.)  When appealing, the claimant can submit written documents, records and other information related to the claim.  (*Id*.)  The review of the decision takes into account all comments, documents, records and other information submitted by the claimant related to the claim.  The Plan states that the review "will not afford deference to the initial adverse benefit determination and will be conducted by a fiduciary of this Plan who is neither the individual who made the adverse determination nor the subordinate of that individual."  (*Id.* at 7.)

C.     **Plaintiff's Submission of Claim**

IDA processed Plaintiff's medical claim and forwarded to the Plan Administrator a copy of the Police Report and medical HUP Records for Plaintiff.  (Moffa Dep. 121-22.)   Based on the Police Report and records indicating that Plaintiff was intoxicated, the Plan Administrator denied Plaintiff's claim pursuant to the Illegality Exclusion because she determined that Plaintiff had engaged in an illegal act and that this act caused or contributed to the accident and resulting

7

injuries.  (Moffa Dep. 164, 167; *see also* Ltr., Apr. 14, 2008, Def.'s Summ. J. Mot. Ex. L.)[7]

On April 8, 2008, IDA sent a letter notifying Defendant of Plaintiff's claims.  The letter advised Defendant that there were claims exceeding $750,000 that had been submitted under the Plan.  The letter specifically brought to Defendant's attention the Illegality Exclusion and IDA's concern that these charges would be excluded under the terms of the Plan pursuant to this Exclusion.  (Ltr., Apr. 8, 2008, Def.'s Summ. J. Mot. Ex. K.)  The letter also notified Defendant that IDA had consulted with Mutual of Omaha, which "opined" that it would deny a reimbursement claim under the Illegality Exclusion, and with a national expert on subrogation, who also "opined" that the claims would be denied by a reinsurance carrier under the Illegality Exclusion.  (*Id.*)  Based on this information, IDA sought Defendant's direction as to whether Plaintiff's claim should be paid.  (*Id.*)

By letter of April 14, 2008, Defendant notified Plaintiff that it would deny Plaintiff's claims because the claims are not covered under the Plan.  (Ltr., Apr. 14, 2008; Moffa Dep. 121, 140.)  Based on the Police Report and the medical records, Defendant determined that Plaintiff's BAC at the time of the accident was approximately 0.192 percent.  Defendant stated that information from the Chester County Court of Common Pleas showed that Plaintiff was cited for several violations of the Pennsylvania Motor Vehicle Code, including operating a motor vehicle while under the

---

[7] Moffa testified that she first determined that Plaintiff had been engaged in an illegal act, as defined in the Plan, based on her conversations with a co-worker, in which she learned that he had been intoxicated at the time of the accident.  (Moffa Dep. 165.)

In addition, Moffa testified that Charles Falcone, Defendant's president at the time, also participated in the decision to deny Plaintiff's claim for benefits.  (*Id*. at 41-42, 150-51.)  When asked to clarify this testimony, however, she said that she was "the one who determined that [driving under the influence with a BAC level above the legal limit] was an illegal act."  (*Id.* at 165.)

influence of alcohol, that Plaintiff was prosecuted for this violation pursuant to the Code, 75 Pa.

Cons. Stat. Ann. § 3802(c), and that Plaintiff has applied for and has been accepted into the ARD

program of Chester County.  (Ltr., Apr. 14, 2008.)  Based on this information, Defendant

concluded:

> Your conduct of operating a motor vehicle while under the influence of alcohol with
> a blood alcohol concentration of .192 [percent] was a violation of Pennsylvania law,
> and therefore constituted an illegal act.  The injuries you sustained as a result of the
> accident were caused by or contributed to your engaging in this illegal act.

(*Id.*)  Accordingly, Defendant denied Plaintiff's claims for medical benefits stemming from the

November 28, 2007 incident.  (*Id.*)

On June 4, 2008, Plaintiff appealed Defendant's determination.  (Ltr., June 4, 2008, Def.'s

Summ. J. Mot. Ex. M.)  Plaintiff contended that Defendant's conclusion that the illegal act of

Plaintiff's BAC being 0.192 percent caused or contributed to the accident was "absolutely

conclusory and not in any way substantiated by law."  (*Id.*)  Plaintiff asserted that Defendant acted

arbitrarily and capriciously "in denying coverage without providing factual support for its

conclusion that [Plaintiff's] alleged intoxication caused the accident."  (*Id.*)  Plaintiff also objected

on grounds that "any citation to the fact that [Plaintiff] accepted ARD as substantiation that his

imbibing of alcoholic beverages somehow was a contributory factor to the accident is improper and

unsupported."  (*Id.*)

On August 18, 2008, at Defendant's request, Richard D. Cohn, Ph.D., Laboratory

Director of DRUGSCAN Medical and Forensic Toxicology Services, located in Warminster,

Pennsylvania, submitted an expert forensic toxicological opinion ("Toxicology Report") on the

significance of the blood alcohol level found in the Police Report, the EMS Report and the HUP

Records.  (Cohn Rep. 1.)  Interpreting the BAC of 0.16 percent, Dr. Cohn opined:

> [I]t is reasonably scientifically certain that [Plaintiff's] blood alcohol concentration was at <u>least</u> 0.16% at the time of the accident, and that at such blood alcohol levels virtually every individual's cognitive faculties and motor skills are sufficiently impaired—relative to one's normal state—so as to have diminished his ability to safely operate a motor vehicle on the highway.

(*Id.* at 3 (original emphasis).)  He concluded that with Plaintiff having a BAC of 0.16 percent, it was "reasonably certain" that:

- Joseph Patrick's sense of care and caution, perception, judgment, response time and coordination were impaired by the deranging effects of the consumed alcohol;

- his circulating blood alcohol level at the time of the accident, was at least 0.16%, even (a) assuming Mr. Patrick to be an experienced drinker and (b) further giving him the benefit of doubt that he had not yet fully absorbed his last drink prior to the time of the motor vehicle accident;

- the degree of impairment was measurably and markedly significant relative to his non-alcohol state;[8]

- the magnitude of this impairment rendered him incapable -

  - to properly judge and perceive his surroundings and act accordingly in a manner providing for his own welfare and that of others; and

  - to perform safety sensitive tasks, including the safe operation of a motor vehicle on the highway

  <u>and</u>

- in the absence of other similarly or more competent causes, was at least causally, if not directly-related to Mr. Patrick's November 28, 2007 motor vehicle accident.

---

[8] At and above a blood alcohol concentration of 0.08 percent, measurable impairment of cognitive faculties and motor skills required to safely operate a motor vehicle have been scientifically and experimentally documented, published in the scientific literature, and reported by the National Highway Traffic Safety Administration (NHTSA).  (Cohn Rep. 4.)

(*Id.* at 4 (original emphasis).)[9]

On December 1, 2008, the Plan Fiduciary denied Plaintiff's appeal based on a review of the Police Report, the records of the Chester County Court of Common Pleas related to the charges of driving under the influence and Plaintiff's acceptance into the ARD program, the records of the Phoenixville Fire Department containing the EMS Report, the HUP Records, Dr. Cohn's Toxicology Report and curriculum vitae, the Pennsylvania Motor Vehicle Code, 75 Pa. Cons. Stat. Ann. § 3802, and the relevant portions of the Plan.  (Ltr., Dec. 1, 2008, Def.'s Summ. J. Mot. Ex. N.)[10]  The Plan Fiduciary denied Plaintiff's appeal because "the charges were for services that are not covered under [the Plan] on the basis of the exclusion for charges for services received as the result of an injury caused by or contributed to by engaging in an illegal act."  (*Id.*)  The Fiduciary stated that "[t]here is no dispute about [Plaintiff's] level of intoxication, and there is no dispute that this level of intoxication impaired his ability to safely operate a motor vehicle on the highway.  This conclusion is corroborated by the analysis of Dr. Cohn."  (*Id.*)[11]  On January 14,

---

[9] Dr. Cohn received a B.S. in Pharmacy from Temple University in 1966, an M.S. in Toxicology from Temple University in 1968 and a Ph.D. in Pharmacology in 1974 from Jefferson Medical College of Philadelphia.  He has received various certifications in the field of forensic toxicology and has over 25 years of experience in performing chemical and toxicological analyses.  He has also authored many publications and conducted presentations on forensic sciences, pharmacology and toxicology.  (Cohn Rep. 5-8.)

[10] 75 Pa. Cons. Stat. Ann. § 3802(a)(2) states that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% but less than 0.10% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle."

[11] The Plan Fiduciary relied upon the following information from the Toxicology Report:

- The blood specimen at HUP showed a serum alcohol concentration of 0.192 percent.  This is equivalent to a blood alcohol concentration of 0.16 percent.

11

2009, Defendant notified Plaintiff by letter of its understanding that he had exhausted all

administrative appeals.  (Ltr., Jan. 14, 2009, Pl.'s Br. Ex. A.)  In response to Plaintiff's request

for the "Plan documents," the January 14 letter enclosed a copy of the Plan and stated that

Defendant was not aware of any other "Plan documents."  (*Id.*)

---

- Because the blood sample was measured one and one-half hours after the accident, and considering the odor of alcohol about Mr. Patrick at the scene of the accident, the magnitude of his blood alcohol level one and one-half hours following the accident, the administration of intravenous fluids prior to the blood draw, and the metabolic and excretory dissipation of alcohol from the body, it is his opinion that the blood alcohol concentration at or about the time of the accident was greater than 0.08 percent and most probably at least 0.16 percent.  In other words, it is Dr. Cohn's opinion that it is reasonably scientifically certain that [Plaintiff's] blood alcohol concentration was at least 0.16 percent at the time of the accident.

- Dr. Cohn concluded that a blood alcohol concentration as exhibited by [Plaintiff] impaired [Plaintiff's] sense of care and caution, perception, judgment, response time and coordination; this degree of impairment was measurably and markedly significant relative to [Plaintiff's] non-alcoholic state; the magnitude of this impairment rendered [Plaintiff] incapable to properly judge and perceive his surroundings and act accordingly in a manner providing for his own welfare and that of others, and to perform safety sensitive tasks including the safe operation of a motor vehicle on the highway; and, absent other similarly or more competent causes, this impairment was at least causally if not directly related to [Plaintiff's] motor vehicle accident.

(Ltr., Dec. 1, 2008.)  The Fiduciary noted that the Pennsylvania Motor Vehicle Code provides "that an individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration of the individual's blood or breath exceeds 0.08 percent" and "[t]he key fact with respect to the violation of the statute are the finding of a blood alcohol concentration exceeding 0.08 percent, thereby being [] . . . at a level that is in violation of the Pennsylvania Motor Vehicle Code."  (*Id.*)  In addition, the Plan Fiduciary relied on the facts of the accident itself, that there had been no adverse weather conditions on the day of the accident, and that there had been no other vehicles involved in the accident.  (*Id.*)  Moreover, there was no evidence of mechanical failure of Plaintiff's vehicle or any other cause of the accident.  (*Id.*)  The fact that Plaintiff was cited by the police for driving under the influence and his acceptance into the ARD program were not determinative to the Fiduciary's decision.  (*Id.*)

On March 19, 2009, Plaintiff filed the instant lawsuit against Defendant and UHY Advisors d/b/a Insurance Design Administrators ("IDA"). Plaintiff's Complaint alleges violations of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, based on Defendant's denial of benefits due to him under the terms of the Plan and IDA's advisory role in the denial of benefits. (Compl., ECF No. 1.) On May 27, 2009, Defendant filed its answer. (ECF No. 4.) On October 27, 2009, the parties stipulated to the dismissal without prejudice of IDA based on Defendant's representation that IDA did not participate in the determination that the Illegality Exclusion applied to Plaintiff's claim for medical benefits. (Stip., ECF No. 6; *see also* Moffa Dep. 30 (testifying that IDA did not tell Defendant what medical claims they recommended to be paid or not paid)).) Plaintiff has filed a Motion for Summary Judgment or Alternatively Motion for Bench Trial. (Pl.'s Mot., ECF No. 17.) Plaintiff argues in his Motion that the denial by the Plan Administrator and Plan Fiduciary of benefits was arbitrary and capricious since there had been no formal conviction of Plaintiff of a crime and there was no causal link established between the accident and Plaintiff's blood alcohol level. Defendant has filed a Motion for Summary Judgment asserting that the Plan Administrator and Fiduciary properly and reasonably exercised their discretion in finding that the Illegality Exclusion applied to Plaintiff's claim for medical benefits, that Plaintiff was engaged in an illegal act at the time of the one-vehicle automobile accident and that the commission of the illegal act was the proximate cause of Plaintiff's injuries. Defendant contends that judgment should summarily be granted in its favor. (Def.'s Mot., ECF No. 18.) Both parties have filed responses. (Def.'s Resp., ECF No. 20; Pl.'s Resp., ECF No. 21; Def.'s Reply, ECF No. 22.)

13

## II.   LEGAL STANDARD

Plaintiff's claim for medical benefits rests on the rights provided by the Employee Retirement Income Security Act ("ERISA").  Accordingly, we have jurisdiction pursuant to 21 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

14

## III.   ANALYSIS

### A.   Standard of Review for Determinations of Plan Administrator and Fiduciary

ERISA permits an individual who has been denied benefits under an employee benefit plan to challenge that denial in federal court. 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.*; *see* § 1132(a)(1)(B). The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, we review its decisions under an arbitrary and capricious standard. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009). "Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan." *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). There are no "magic words" determining the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly. *Id.* However, when a plan is ambiguous, it is construed in favor of the insured. *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1258 (3d Cir. 1993). "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies." *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).[12]

---

[12] Courts have noted that in determining whether benefits under a plan governed by 29 U.S.C. § 1132(a)(1)(B) were properly denied, courts review for "abuse of discretion." *See, e.g.*, *Funk v. CIGNA Group Ins.*, 648 F.3d 182, 190 n.10 (3d Cir. 2011); *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011). "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am.*

Here, the Plan states:

> It is the express intent of the Plan that *the Plan administrator shall have maximum legal discretionary authority* to construe and interpret the terms and provisions of this Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to the Plan Participants rights, and to decide questions of Plan interpretation and those of fact relating to this Plan.

(Plan 17 (emphasis added).)  This language is unambiguous.  It provides the Plan Administrator with maximum discretionary authority to make eligibility determinations.  Accordingly, we review the Administrator's and Fiduciary's decisions under an arbitrary and capricious standard.

Citing the sliding scale approach set forth in *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (2000), Plaintiff argues that the "highest level of scrutiny" must be applied to Defendant's denial of Plaintiff's claim for benefits because this is a case in which the employer incurs direct expenses as a result of allowing benefits, thereby creating a conflict of interest. (Pl.'s Br. 7-10, ECF No. 17.)[13]  Defendant, also citing the standard set forth in *Pinto*, contends that any conflict caused by the fact that Defendant both funds and administers benefits is "counterbalanced" by the fact that Plaintiff was Defendant's employee at the time he applied for benefits, and employers have incentives to avoid the loss of morale and higher wage demands that could result from denying benefits.  As a result, Defendant contends that there is no justification for use of a heightened arbitrary and capricious standard.  (Def.'s Br. 12, ECF No.

---

*Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011); *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

[13] Under the sliding scale approach, "when an insurance company both funds and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious standard of review."  *Pinto*, 214 F.3d at 378.  The court in *Pinto* explained that "'smoking gun' direct evidence of purposeful bias is rare in these cases so that, without more searching review, benefits decisions will be virtually immunized."  *Id.* at 379.

18.)

In 2008, the Supreme Court clarified how a conflict of interest should be accounted for in judicial review of a discretionary benefits determination. *Glenn*, 554 U.S. at 115. In *Glenn*, the Supreme Court explained that in reviewing the lawfulness of benefit denials, judges should account for several different considerations of which a conflict of interest is one. *Id.* at 117.[14] The conflict of interest should prove more important where circumstances suggest a higher likelihood that the conflict affected the benefits decision, including but not limited to cases where an administrator has a history of biased claims administration. However, the conflict should prove less important where the administrator has taken active steps to reduce potential bias and to promote accuracy. An example of this situation would be where administrators have been walled-off from those interested in firm finances, or where the insurance company has imposed management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits. *Id.* Furthermore, the Third Circuit has stated that in light of the Supreme Court's decision in *Glenn*, the sliding scale approach is no longer valid. *See Howley*, 625 F.3d at 793 (holding that conflict of interest does not alter standard of review for evaluating decision to deny benefits); *Doroshow*, 574 F.3d at 234 (holding that *Glenn* overruled Third Circuit precedent requiring courts to apply a heightened arbitrary and capricious review where there is a conflict of interest); *Estate of Schwing*, 562 F.3d at 525 (finding "that, in light of [*Glenn*], our 'sliding scale' approach is no longer valid"); *Ellis v. Hartford Life & Accident Ins. Co.*, 594 F. Supp. 2d 564,

---

[14] The factors may include procedural concerns about the administrator's decision-making process and structural concerns about the conflict of interest inherent in the way the ERISA-governed plan was funded. However, these factors are case-specific, and the facts of one case may present an entirely different set of considerations than for another case. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009).

567 (E.D. Pa. 2009) ("Because the conflict does not impose a heavier burden on the insurer to justify its denial decision, the sliding scale can no longer be used as a tool to modify the standard of review."); *Anderson v. Bakery & Confectionery Union*, 654 F. Supp. 2d 267, 278 (E.D. Pa. 2009) (same); *cf. Funk*, 648 F.3d at 190 (holding that conflict of interest is one of many factors to be considered in reviewing a plan administrator's exercise of discretion).  Therefore, we review the Plan Administrator's and Fiduciary's determination under the arbitrary and capricious, or abuse of discretion, standard and, in addition, evaluate how any conflict of interest on the part of Defendant factored into its determination to deny Plaintiff's claim for medical benefits.

      **B.**     **The Plan Administrator's and Fiduciary's Determination to Deny Plaintiff's Claim for Medical Benefits Was Supported by Substantial Evidence**

      "[A] plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."  *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000) (internal quotations omitted).  A court may not substitute its judgment for that of the defendants in determining eligibility for plan benefits.  *Id.*  "Whether a claim decision is arbitrary and capricious requires a determination whether there was a reasonable basis for [the administrator's] decision, based upon the facts as known to the administrator at the time the decision was made."  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 199-200 (3d Cir. 2002).  Similarly, an administrator's decision constitutes an abuse of discretion only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Howley*, 625 F.3d at 792 (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).

Plaintiff contends that Defendant's use of the Illegality Exclusion to deny his claim was arbitrary and capricious on two grounds.  First, he contends that the determination was arbitrary and capricious because the denial was based on an invalid legal conclusion.[15]  He contends that the record does not support Defendant's determination that Plaintiff's elevated BAC caused or contributed to the accident.  (Pl.'s Br. 12.)  Defendant counters that the record before the Plan Administrator and Fiduciary showed that Plaintiff was intoxicated well above the legal blood alcohol limit at the time of the accident, in violation of the Pennsylvania Motor Vehicle Code, and the evidence established a causal link between Plaintiff's driving while intoxicated and the November 28 accident.  (Def.'s Br. 13-16.)

The Plan Administrator relied upon the Police Report, underlying medical records and information from the Chester County Court of Common Pleas in determining that Plaintiff's operation of a motor vehicle while under the influence and having a BAC of 0.192 percent violated Pennsylvania law and therefore constituted an illegal act.  (Ltr., Apr. 14, 2008; *see also* Moffa Dep. 110, 121.)  The Fiduciary reviewed these documents, as well as the records of the Phoenixville Fire Department containing the EMS Report, the HUP Records, Dr. Cohn's Expert Report and curriculum vitae, the Pennsylvania Motor Vehicle Code 75 Pa. Cons. Stat. Ann. § 3802 and relevant portions of the Plan.  Based on the facts contained in these documents, there was a reasonable basis for and substantial evidence supporting the decision to deny Plaintiff's claim for

---

[15] In his opening brief, Plaintiff argues that the invalid legal conclusion was based on equating Plaintiff's acceptance into the ARD program with a guilty plea.  (Pl.'s Br. 11.)  However, Plaintiff subsequently concedes that the Plan Administrator did not rely upon Plaintiff's acceptance into the ARD program in determining that he had been engaged in an illegal act.  Plaintiff concedes that the Plan Administrator based her conclusion that Plaintiff had committed an illegal act on the fact that Plaintiff had a BAC of 0.192 percent at the time of the accident in violation of Pennsylvania law.  (Pl.'s Resp. 5-6.)

medical benefits.

The evidence substantially supported Defendant's finding that Plaintiff was intoxicated and was driving under the influence of alcohol, well above the legal limit, at the time of the accident. The Police Report indicated that Plaintiff admitted that he had been drinking.  The hospital records affirmed this finding.  While the tests on Plaintiff showed negative results for drugs, such as amphetamines, opiates, barbiturates, benzodiazepines, THC and methadone, an ETOH test showed that Plaintiff's BAC level was 0.16 percent, which was well above Pennsylvania's legal limit of 0.08.  The Initial Inpatient Admission/Consultation form of the HUP Records stated that Plaintiff was intoxicated.  His physical examination revealed that he was obviously intoxicated and he admitted to having consumed a considerable amount of alcohol.

Other evidence considered by the Fiduciary confirmed Plaintiff's intoxication.  Plaintiff told the EMS crew that he had "had a lot to drink."  The EMC crew observed ETOH odor on Plaintiff.  Furthermore, the Toxicology Report indicated that Plaintiff's BAC at the time of the accident was at least 0.16 percent.  The conclusion that Plaintiff was intoxicated and was driving under the influence of alcohol at the time of the accident was supported by overwhelming evidence.  *See Capone,* 592 F.3d at 1200 (finding reasonable to draw the conclusion that plaintiff was under the influence of alcohol at the time of the accident based on results of blood serum test, medical records and toxicology report); *Carter v. Ensco Inc.*, 438 F. Supp. 2d 669, 674 (W.D. La. 2006) (finding that medical records, discharge summary and police report "amply supported" the determination that plaintiff had been operating a vehicle under the influence of alcohol at the time of the accident).  Moreover, Defendant's legal determination that operating a vehicle under the influence of alcohol at a BAC well above the legal limit was an illegal act

under the Plan was reasonable.  *See Carter*, 438 F. Supp. 2d at 675 (finding that company's

determination that operating a vehicle while intoxicated constituted an illegal activity within the

meaning of the benefits plan was a "fair and reasonable interpretation").

      The evidence also substantially supported Defendant's finding that Plaintiff's intoxication

caused, or at least contributed to, the accident and the resulting injuries to Plaintiff.  The Police

Report, which included information from three eyewitnesses, indicates that Plaintiff was traveling

at a high rate of speed when he failed to negotiate a curve, and his vehicle left the highway and

traveled over 200 feet before hitting a fixed stone sign.  After hitting the sign, the vehicle went

airborne, turned over several times and landed back on the roadway.  No other vehicles were

involved in the accident.  Although it was dark at the time, the roads were dry, and there were no

adverse weather conditions.  In the Police Report, Officer Kane ruled out environmental or

roadway factors and possible vehicle failures as potential contributing factors in the accident.

The failure to use a seatbelt was not the cause of Plaintiff's injuries, as it was determined that

Plaintiff had been wearing one at the time of the accident.  Based on his observations, Officer

Kane opined that the driver was under the influence of alcohol at the time of the accident and

therefore was not capable of operating a vehicle in a safe manner.  Speed was a secondary factor

in the accident.  Consistent with this opinion, the Initial Inpatient Admission/Consultation form

of the HUP Records stated that Plaintiff was intoxicated.  Dr. Cohn's Toxicology Report opined

that at a BAC of 0.16 percent, "virtually every individual's cognitive faculties and motor skills

are sufficiently impaired—relative to one's normal state—so as to have diminished his ability to

safely operate a motor vehicle on the highway."  (Expert Rep. 3.)  He also opined that with this

BAC level, Plaintiff's perception, judgment, response time and coordination were impaired, that

this impairment prevented him from being able to safely operate a motor vehicle on the highway, and that in the absence of other causes, his consumption of alcohol caused or contributed to the November 28, 2007 accident.  In view of Dr. Cohn's education and over 25 years of experience in performing chemical and toxicological analyses, it was reasonable for the Fiduciary to rely on his opinion on causation.

Defendant argues that Plaintiff needed an accident reconstruction expert, not a toxicologist, to establish causation.  We disagree.  This is not a situation in which Defendants simply presumed causation in light of the elevated BAC levels found in Plaintiff at the time of the accident.  The facts of this accident, coupled with the documentary evidence, including a police report supported by eyewitnesses, EMS records, hospital records and the report from Dr. Cohn, all supported the finding that driving while intoxicated contributed to the happening of this accident.[16]  Furthermore, there is no evidence, and Plaintiff has presented nothing, to suggest that something other than alcohol caused or contributed to the accident's occurrence.

Plaintiff argues that Defendant's determination was insufficiently supported because there was no analysis of the curve in the road or general road conditions at the time of the accident. However, the Police Report stated that there were no adverse road conditions at the time of the

---

[16] In *Smathers*, the Third Circuit rejected the employer's argument that because the plaintiff, a former employee, had been intoxicated, his condition must have affected his driving so as to cause or contribute to the accident.  The court in *Smathers* explained that although the plaintiff's BAC was very high, evidence of causation was needed.  Specifically, the court required the employer to point to evidence that if the plaintiff's BAC had not exceeded the legal limit, the accident would not have happened, since there was nothing in the record that showed that a sober person faced with "an emergency situation of a stalled car backing into the middle of a dark road before him might not have met the same fate." 298 F.3d at 200 n.15.  The facts of the instant case are easily distinguished.  Plaintiff faced no emergency situation here.  No other vehicle was involved in this accident.  There is expert testimony that supports Defendant's conclusion, and Plaintiff has offered no alternative explanation as to why this accident occurred.

accident, and Plaintiff has not presented evidence that shows otherwise.  Moreover, in view of the multiple records and reports which demonstrate that, at a minimum, Plaintiff's intoxicated condition impaired his perception, judgment, response time and coordination, and therefore contributed to the accident, there was no need for Defendant to conduct an independent analysis of the curve in the road.  *See Am. Med. Security Group Inc. v. Meyers*, 329 F. Supp. 2d 1039, 1045 (S.D. Iowa 2004) (rejecting non-moving party's argument that the issue of medical causation is within the province of expert witnesses and cannot be determined without expert testimony, since numerous records demonstrated a causal connection and the non-moving party did not produce any evidence to the contrary).  To the extent that Plaintiff is arguing that an analysis by an accident reconstruction expert should have been part of the administrative record, the burden to ensure that the administrative record on appeal is complete is on Plaintiff. *Fabyanic v. Hartford Life & Accident Ins. Co.*, No. 08-400, 2009 WL 775404, at *11 (W.D. Pa. Mar. 18, 2009).  Certainly, Plaintiff could have submitted a report from an accident reconstruction expert if he had chosen to do so.

Plaintiff also asserts that a Plan Administrator "cannot be the ultimate authority on . . . what constitutes illegality."  (Pl.'s Br. 13; *see also* Pl.'s Resp. 6 ("Nothing in the plan provisions would allow the plan administrator to provide an extra-governmental definition of what constitutes illegality.").)  However, the Plan expressly authorizes the Plan Administrator to have maximum legal discretion.  (Plan 17.)  *See Carter*, 438 F. Supp. 2d at 671 & n.1 (noting that where Plan expressly provides the administrator with "maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan" the contention that the administrator does not have discretion to interpret the Plan's terms is without support).

Clearly, the determination by Defendant here was neither arbitrary nor capricious in light of the evidence before it.  *See Nally v. Life Ins. Co. of N. Am.*, 299 F. App'x 125, 130 (3d Cir. 2008) (finding that it was not unreasonable for administrator to conclude that high-speed, single-vehicle accident was a result of hypoglycemia in view of witness descriptions and the fact that police had found no evidence of mechanical failure, poor driving conditions or drug use by the plaintiff).

### C.   Any Conflict of Interest on the Part of Defendant Does Not Undermine the Plan Administrator's and Fiduciary's Determination

Plaintiff contends that the conflict of interest was overwhelming in this case in light of the large sum of money at stake, in excess of $750,000.  He argues that "the great scrutiny given [to] the Patrick claim had everything to do with the amount of money involved and little to do with the underlying facts."  (Pl.'s Br. 11.)  Since Defendant both funds and administers benefits to its employees making such claims, it acts under a conflict of interest that deserves scrutiny. *Pinto*, 214 F.3d at 378.  Accordingly, we must determine how and to what extent, if any, the conflict of interest faced by Defendant affected its decision to deny Plaintiff's claim for medical benefits.

On the one hand, as Plaintiff notes, Defendant has an incentive to deny Plaintiff's claim in view of the fact that the claims exceeded $750,000 and that Defendant would have to fund the account for the claims.  (*See* Moffa Dep. 30.)  In light of the Illegality Exclusion, it was probable that the stop-loss insurer would deny coverage.  (*See* Roslokken Dep. 74-75.)  In addition, this claims process is not entirely separate and distinct from the funding process.  (*See* Moffa Dep. 48-49 ("[I]f there was a big claim issue, [Defendant's Controller] would know about it, because he would have to fund the account."); Clark Dep. 15 (testifying that although he was not

24

involved in the denial of claims for eligibility, he has "gone back and questioned the eligibility of coverage under a plan for a claim that was submitted to Defendant for payment by IDA"), 44 (noting conversations between Controller and Administrator regarding status of Plaintiff's claim).)  On the other hand, there is no evidence that Defendant has a history of biased claims administration.

Plaintiff contends that Defendant failed to comply with the procedures required by the Plan, as evidenced by the lack of a "set method of questioning" or "specific guidelines" for applying the Illegality Exclusion.  (Pl.'s Br. 10-11; *see also* Pl.'s Resp. 7 (contending that Defendant had "no formal screening process as to the applicability of the 'illegality' exclusion").) However, the record reflects otherwise.  In determining whether the Illegality Exclusion would apply, the Plan Administrator would talk with the employee-claimant and possibly other employees, and as for all claims including those not involving illegal activity, would send out questionnaires.  (Moffa Dep. 74.)  With respect to Plaintiff's claim for medical benefits, the Plan Administrator conducted the standard, customary investigation.  (*Id.* at 31-33, 53, 55-59, 77-79.) Moreover, the Plan Administrator testified that for all claims arising from vehicle accidents, she checked blood alcohol and drug levels, the tests which were standard procedure for the hospitals involved.  (*Id.* at 64-66.)  For example, for the claim stemming from the motorcycle accident, which also involved a significant amount of money, the Plan Administrator reviewed the hospital records for the patient's BAC.  (*Id.* at 75.)  Here, the Plan Administrator reviewed the HUP records for Plaintiff's BAC levels in making a decision on Plaintiff's claim.  Plaintiff asserts that "the great scrutiny given [to] the Patrick claim had everything to do with the amount of money involved and little to do with the underlying facts."  (Pl.'s Br. 11.)  However, while there is evidence that

25

prior to denying this claim, Defendant had knowledge that the claim was large (*see, e.g.*, Clark Dep. 25), the record is more than sufficient to support Defendant's denial.  Moreover, there is no evidence to support the assertion that Defendant did not conduct a reasonable investigation.

Furthermore, the fact that the Illegality Exclusion had been applied in only one other case does not demonstrate that the conflict of interest materially affected the decision of the Plan Administrator or the Fiduciary.  (*See* Pl.'s Br. 9; Madonna Dep. 18; Clark Dep. 30.)[17]  Daniel Roslokken, general counsel for IDA, explained that out of the million of claims administered in a year at IDA, it is rare for a claim to be excluded based upon an illegality exclusion provision such as the Illegality Exclusion at issue here because the circumstances underlying such an exclusion are rare.  (Roslokken Dep. 7, 39-40.)  In his fourteen years as general counsel at IDA, Roslokken only recalled one claim involving driving under the influence.  He did not recall whether that claim resulted in a grant or denial of benefits.  (*Id.* at 51-53.)

Moreover, none of the evidence that the Plan Administrator or Fiduciary considered and relied upon in making this determination was unusual or out of the ordinary for a claim such as this.  *See, e.g.*, *Smathers*, 298 F.3d at 193 (examining plaintiff's BAC level); *Carter*, 438 F. Supp. 2d at 672  (examining police report, hospital records, physician's consultation report and emergency room notes); *Wilson v. Metro. Life Ins. Co.*, No. 04-5477, 2006 WL 3702635, at *9 (E.D. Pa. Dec. 13, 2006) (finding that administrator's determination was supported by substantial evidence in the form of a doctor's report interpreting the plaintiff's medical records); *Jones v. Aetna Life Ins. Co.*, No. 01-2476, 2002 WL 1870469, at *4 (E.D. Pa. Aug. 14, 2002) (examining

---

[17] The Plan Administrator testified that she had not had any other denials of claims based on intoxication while operating a vehicle or based on application of the Illegality Exclusion. (Moffa Dep. 65, 68.)

police report, toxicology report, operative report from the hospital and medical records relating to the accident and injury).

The reality here is that Plaintiff's claim that his driving while intoxicated did not cause or even contribute to the happening of this accident defies common sense and human experience. This accident is a perfect example of why legislatures in every state have enacted DUI laws.  The denial of this claim was not based upon the amount of the bills or a conflict of interest.  It was based upon a provision of the Plan that simply could not be disregarded.  The decision to deny the claim was based upon substantial evidence.  It was not arbitrary or capricious.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion will be granted, and Plaintiff's Motion will be denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**

27